UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| KATHLEEN A. WARREN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO.: 1:12-cv-1705-SEB-DML |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of the | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

## ORDER

Kathleen A. Warren seeks judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") denying her application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act.

As addressed in this Order, the court finds that the Commissioner's decision must be REVERSED and REMANDED.

## Administrative Proceedings

Ms. Warren applied for DIB on January 23, 2006, and alleged that her disability began on February 1, 2005, due to "fibromyalgia, high cholesterol, depression, and anxiety." (R. 150, 179). She was last insured for DIB on December 31, 2010, and must have become disabled by that date to be eligible for benefits. Her application was denied initially and after reconsideration, and an administrative hearing was held on February 4, 2009, before Administrative Law

Judge James R. Norris. He issued a decision that Ms. Warren was not disabled because she could perform her past relevant work (R. 89-105), but the Appeals Council remanded and directed the ALJ to consider several issues that were not addressed or were insufficiently explained in his decision. (R. 66-68). ALJ Norris conducted a second hearing on April 19, 2011, at which Ms. Warren, two medical experts, and a vocational expert testified. On August 12, 2011, the ALJ issued his decision finding that Ms. Warren was not disabled as of her date last insured because there were a significant number of jobs available consistent with her functional capacity. The Appeals Council denied Ms. Warren's request for review on October 9, 2012, making the ALJ's August 12, 2011 disability determination the final decision of the Commissioner. *O'Connor-Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir. 2010). Ms. Warren timely filed this action for judicial review of the Commissioner's final decision.

## Applicable Standards

To be eligible for disability benefits under the Social Security Act, a claimant must prove she is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). There must be medical evidence of an impairment that results "from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical

and laboratory diagnostic techniques," and disability may not be adjudged only by a claimant's description of her symptoms. 20 C.F.R. § 404.1508.

The Social Security Administration has prescribed a "five-step sequential evaluation process" for determining disability. 20 C.F.R. § 404.1520(a)(4). The first step inquires whether the claimant is engaged in substantially gainful activity. If she is not, the second step inquires whether the claimant suffers from any severe impairment, which is an impairment that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If there is at least one severe impairment, then step three compares the claimant's impairments, singly or in combination, to medical conditions included in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, which are defined by criteria that the Administration has pre-determined are disabling. If the claimant's impairments meet or medically equal in severity the requirements of a listing, then the claimant is deemed disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant's impairments do not satisfy a listing, then her residual functional capacity ("RFC") is determined for purposes of steps four and five. RFC is a claimant's ability to do work on a regular and continuing basis despite her impairment-related physical and mental limitations. 20 C.F.R. § 404.1545. At the fourth step, if the claimant has the RFC to perform her past relevant work, then she is not disabled. 20 C.F.R. § 404.1520(f). If she cannot perform her past work, the analysis proceeds to the fifth and final step, at which the claimant's age, work experience, education, and RFC are evaluated to determine whether she is capable

of performing any other work available in the relevant economy.  20 C.F.R. § 404.1520(g).  The claimant bears the burden of proof at steps one through four, and at step five the burden shifts to the Commissioner.  *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 352 (7th Cir. 2005).

The task a court faces in a case like this is not to attempt a *de novo* determination of the plaintiff's entitlement to benefits, but to decide if the Commissioner's decision is supported by substantial evidence and is otherwise free of legal error.  *Kendrick v. Shalala,* 988 F.2d 455, 458 (7th Cir. 1993).  "Substantial evidence" has been defined as "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison v. NLRB,* 305 U.S. 197, 229 (1938)).

## The ALJ's Findings

Ms. Warren was born in 1957 and was 53 years old as of her last insured date of December 31, 2010.  In 1979, she earned degrees in Journalism and Business Administration from Butler University.

At step one of the sequential evaluation process, the ALJ found that Ms. Warren had not engaged in substantial gainful activity since her alleged onset date of February 1, 2005.  Her part-time work at a department store from February 28, 2005, through July 8, 2005, had been classified by the SSA as an unsuccessful work attempt, and the ALJ found no evidentiary basis to disturb that conclusion.  At step two, the ALJ concluded that Ms. Warren suffered from severe impairments of

4

fibromyalgia, depression, anxiety, and dependent personality disorder, but that none of them, alone or in combination, met or medically equaled any of the medical conditions set forth in the Listing of Impairments.

Next, the ALJ made an RFC determination and concluded that Ms. Warren had the capacity to perform a modified range of light work with restrictions to accommodate her mental impairments. The ALJ determined that Ms. Warren had the mental capacity to understand, remember, and follow simple instructions and, in the context of performing simple and repetitive tasks, that she could sustain the attention and concentration necessary to carry out tasks with reasonable pace and persistence. He found that she could not work if greater than average production rates were imposed and could tolerate only incidental contact with supervisors, co-workers, and the general public.

With this RFC, the ALJ found that Ms. Warren could not perform her past relevant work as a bank branch manager, and he moved to step five to determine whether, based on Ms. Warren's vocational profile and her RFC, work existed in sufficient numbers in the relevant economy that she is capable of performing. Based on the testimony of a vocational expert, the ALJ found that Ms. Warren's capabilities fit the demands of unskilled, light jobs of cleaner, inspector, and hand packager, positions that are available in significant numbers in Indiana. Accordingly, the ALJ found at step five that Ms. Warren was not disabled at any time between her alleged onset date and her last insured date of December 31, 2010.

## Analysis

Ms. Warren contends that the ALJ's decision must be reversed and remanded on the grounds that the ALJ's RFC determination erroneously failed to reflect (a) the opinions of three of Ms. Warren's treating physicians and (b) an opinion of Dr. Manders, who provided expert medical testimony at the hearing. She further asserts that, even if the ALJ's decision to exclude from his RFC certain functional limitations is supported by substantial evidence, the step five decision cannot stand. This is so, she argues, because the ALJ's hypothetical question to the vocational expert did not account for all of the functional limitations that the ALJ *did* find were supported by the record and were included in his assessment of Ms. Warren's RFC.

We first address the opinions of the treating physicians and Dr. Manders, and then address whether the ALJ's hypothetical question to the vocational expert took proper account of all functional limitations the ALJ had determined for Ms. Warren's RFC.

I.   The opinions of Ms. Warren's treating physicians

   A. The opinions of Drs. Smith and Lewis

Dr. Jaclyn Smith and Dr. Hayley Lewis treated Ms. Warren for her fibromyalgia symptoms. Dr. Smith had seen Ms. Warren approximately every three months since July 2005 and completed a residual functional capacity questionnaire dated June 16, 2006. (R. 225-229). Dr. Lewis, an osteopathic physician, began to see Ms. Warren in August 2007 and continued thereafter about every two or three months. She completed a residual functional capacity questionnaire dated April 22,

2008. (R. 451-455). Dr. Smith opined that Ms. Warren's pain and other symptoms from fibromyalgia would interfere on a frequent basis with Ms. Warren's ability to sustain attention and concentration and that she was incapable of performing even "low stress" jobs. Dr. Smith also opined that Ms. Warren's abilities to sit, stand, and walk were extraordinarily limited, lasting no more than a total of two hours in combination during an 8-hour work day. She would need to take one-hour rest breaks during the day to lie down, and if she engaged in prolonged sitting, she would need to elevate her legs above the level of her heart for 30-35 minutes during an 8-hour work day. She could not engage in work requiring grasping, twisting, and turning of objects with her hands, or requiring fine manipulations of her fingers, or reaching her arms overhead. Dr. Smith also stated that Ms. Warren would likely miss work more than four days per month. Finally, Dr. Smith stated that all of these functional limitations had existed since September 2001. (R. 229).

Dr. Lewis's opinion regarding Ms. Warren's functional abilities, dated April 2008, was materially identical to Dr. Smith's opinion, and she also stated that all of these limitations had existed since September 2001. (R. 451-455). Dr. Lewis recorded her opinions using the same form of questionnaire that Dr. Smith had used, which had been supplied by Ms. Warren's lawyer.

### B. The opinions of Dr. Nurnberger

Dr. Nurnberger, a psychiatrist with whom Ms. Warren began treatment on June 20, 2006, completed two "Mental Impairment" questionnaires in which he provided his opinions regarding functional limitations stemming from Ms. Warren's

mental impairments. The first questionnaire is dated July 13, 2006 (R. 397-402), and the second is dated August 18, 2010 (R. 482-487). The section of the questionnaires regarding functional limitations is a check-the-box format. Dr. Nurnberger's two opinions, completed four years apart, are materially identical. Among other things, he checked the boxes that Ms. Warren is unable to (a) maintain regular attendance at a job, (b) perform work at a consistent pace without an unreasonable number and length of rest periods, or (c) deal with normal work stress. (*See* R. 399, 484).

### C. The Treating Physician Rule

A medical opinion by a treating physician about the nature and severity of a claimant's impairments, including any resulting mental or physical restrictions, is entitled to "controlling weight" if it is well-supported by objective medical evidence and is not inconsistent with other substantial evidence. 20 C.F.R. § 404.1527(d)(2); *Punzio v. Astrue,* 630 F.3d 704, 710 (7th Cir. 2011) ("[T]reating physician's opinion is entitled to controlling weight only if it is not inconsistent with other substantial evidence in the record.") If a treating physician's opinion is not entitled to controlling weight, it still must be evaluated using the same factors relevant to weighing other medical opinions. That is, the ALJ must decide the weight to accord it based on the degree to which the medical opinion (a) is supported by relevant evidence and explanations; (b) considered all evidence pertinent to the claimant's claim: (c) is consistent with the record as a whole; and (d) is supported or contradicted by any other factors. *Id.* § 404.1527(c)(3)-(6). The physician's field of

specialty and the nature and extent of her treatment relationship with the claimant are also considered. *Id.* § 404.1527(c)(2)(i) and (c)(2)(ii).

### 1. The ALJ's Evaluation of Opinions of Drs. Smith and Lewis

The ALJ rejected the opinions of Drs. Smith and Lewis primarily on the grounds that Ms. Warren had worked at a full-time job until January 2005, that she had lost her job "for excessive absences that were unrelated to her medical problems," and that there was nothing in the record to show that her medical problems worsened severely after she lost her job. (R. 35). The ALJ noted that the record evidence of pain and fatigue, the effects of which were the bases for the highly restrictive physical limitations provided by Drs. Smith and Lewis, showed that Ms. Warren's signs of fatigue and pain improved over time. (Ms. Warren had reported modest levels of pain to the consultative psychologist and also to a rheumatologist who had examined her in 2010.)[1] The ALJ also noted that Ms. Warren's pain and fatigue symptoms had responded favorably to medication and to physical exercise that her doctors advised her to do, and that her delay in seeking

---

[1] Ms. Warren argues that the ALJ's use of the word "sign" to describe pain and fatigue, as opposed to the word "symptom" means that the ALJ had improperly required Ms. Warren to show "objective" proof of pain and fatigue. She also argues that the ALJ's comment about two treatment records from Dr. Lewis—one stating that Ms. Warren did not seem ill or in distress, and another noting normal range of motion and essentially normal neurological findings—indicate that the ALJ gave short shrift to her symptoms from fibromyalgia because these matters are not indicia of fibromyalgia. The court disagrees with these points. There is no indication that the ALJ rejected Ms. Warren's complaints of pain and fatigue on the basis that objective tests did not measure pain and fatigue. The ALJ's opinion reflects a detailed review of Ms. Warren's fibromyalgia treatment and his evaluation of Ms. Warren's symptoms from fibromyalgia—her reports of pain and fatigue—in light of the overall evidence in the record.

treatment from a specialist in rheumatology severely undermined the credibility of her complaints of severe pain and fatigue. (R. 30). There is record support for these observations by the ALJ.

For example, as of September 2005, Dr. Smith reported that Ms. Warren's fibromyalgia had significantly improved. That improvement, the ALJ found, coincided with Ms. Warren's therapeutic exercise regimen. In January 2006, when she reported increased pain, Ms. Warren also stated that she had stopped exercising. (R. 30). The ALJ cited similar evidence indicating that Ms. Warren's pain and fatigue were ameliorated by medication and that when she failed to fulfill her prescriptions, she reported worsening symptoms. (R. 30).

The evidence relating to Ms. Warren's failure for nearly one year to make an appointment with a specialist in rheumatology also convinced the ALJ that Ms. Warren did not suffer from the level of severe pain and fatigue on which Dr. Smith's and Dr. Lewis's opinions were based. In October 2009, Ms. Warren was referred to a rheumatologist, yet she did not finally see a rheumatologist until September 2010, nearly a year later. Ms. Warren stated that she had forgotten to make an appointment, which the ALJ found "remarkable" given the severity of symptoms Ms. Warren was reporting—needing to spend almost all day in bed and experiencing pain symptoms of 9 on a 1-10 scale. (R. 30. The ALJ also pointed out that the rheumatologist "did not report any significant pain behavior, or substantial signs of fatigue" and had recommended follow-up care in six weeks, yet Ms. Warren did not follow that recommendation either. (R. 31).

These are sufficient grounds supporting the ALJ's decision to reject the extraordinarily limited functional capacity restrictions provided by Drs. Smith and Lewis.

### 2. The ALJ's Evaluation of Dr. Nurnberger's Opinion

The ALJ determined that Dr. Nurnberger's assessment of Ms. Warren's mental impairments "are eminently refuted by a greater portion of the clinical record, including the modest clinical findings reported on separate exams, as well as the claimant's favorable response to medication treatment." In Dr. Nurnberger's view, Ms. Warren could not work because of her major depressive disorder and generalized anxiety disorder. He reached his opinion in July 2006, about one month after his first examination of Ms. Warren, and his opinion regarding Ms. Warren's functioning remained the same as of August 2010, when Dr. Nurnberger completed a second questionnaire regarding Ms. Warren's functional capacity.

Ms. Warren contends that the ALJ's evaluation of Dr. Nurnberger's opinion was wrong because Dr. Nurnberger's treatment records describe some symptoms that are supportive of Dr. Nurnberger's functional restrictions and because the ALJ's RFC should have reflected "at least some of Dr. Nurnberger's more restrictive opinions." (Dkt. 17 at pp. 18-19). This argument is insufficient to undermine the ALJ's synthesis of the entire record in deciding to reject Dr. Nurnberger's views. The ALJ was permitted to view Dr. Nurnberger's opinion in light of (1) the entire clinical record, (2) Ms. Warren's favorable response to medication, (3) a physician's report that Ms. Warren's medication regimen as of August 2006 was of such efficacy

that psychologically she "was almost symptom-free" (R. 32), (4) the evidence of Ms. Warren's adaptive functioning (her ability to "sustain ordinary household tasks," to do part-time work videotaping educational sessions, and to enjoy reading and watching television), and (5) her performance at mental status examinations that did not show substantial deficits in attention, memory, or concentration.

Because the ALJ gave sufficient reasons supported by the evidence for rejecting Dr. Nurnberger's opinion regarding Ms. Warren's mental impairments and their restrictions on her functioning, we cannot find that the ALJ erred in his evaluation.

II.     The ALJ's Evaluation of Dr. Manders's Opinion

Dr. Manders testified as a medical expert at the administrative hearing. He testified about controversy within the medical community over whether fibromyalgia should be evaluated as a "legitimate medical condition," and indicated his agreement that the malady is not a specific medical impairment. The ALJ rejected Dr. Manders's view and decided that although fibromyalgia may be difficult to diagnose, the medical community has accepted certain diagnostic tools to determine whether a person suffers from fibromyalgia, and the ALJ accepted that fibromyalgia was "generally indicated in the claimant's medical file." (R. 29). The ALJ's opinion includes little else about Dr. Manders's testimony except to report that Dr. Manders agreed that Ms. Warren's subjective pain complaints "appeared complicated by her psychological problems." (R. 28).

Ms. Warren contends that the ALJ erred by not expressly evaluating comments made by Dr. Manders regarding her functional capacity.  In response to the ALJ's question whether Dr. Manders, based on the record, would "put any limitations" on Ms. Warren, Dr. Manders answered no, but then said Ms. Warren "should have a job [in] which she can stand, sit, move about, when that gets tiresome, do something else."  (R. 730).  He also said in conjunction with discussing whether any listing was met, that "[t]here's nothing there [in the record] except, from a functional standpoint, she's going to miss a lot of time from work because of her complaints.  And that I verify, but I can't put a – I can't put a diagnosis on it.  I mean, she's diagnosed with fibromyalgia, but there's nothing here."  (R. 733).

We agree with the Commissioner that Dr. Manders's stray comments are not a definitive opinion regarding Ms. Warren's functional abilities stemming from any impairment identified by him.  There is nothing in his comments to translate into a determination about how much Ms. Warren should stand, or sit, or move about, or what he meant by missing a lot of time from work.  The latter comment, in context, appears only to repeat a statement provided by Drs. Smith and Lewis, rather than to endorse it.  As Ms. Warren concedes, the ALJ had good grounds for rejecting Dr. Manders's overall assessment of her medical impairments; indeed, she contends that it would have been legal error if the ALJ had *not* rejected Dr. Manders's views of fibromyalgia.  Because of the ALJ's rejection of Dr. Manders's medical assessment of Ms. Warren's medical impairment and because his comments on

13

functioning are equivocal and imprecise at best, we do not find error in the ALJ's failure to address those comments in his decision.

III. The ALJ's RFC and Hypothetical to the Vocational Expert

Ms. Warren's final assertion of error focuses on the ALJ's RFC, and concerns whether the ALJ included within his hypothetical question to the vocational expert all of the functional restrictions he found were supported by the record. She also contends that her difficulties with concentration, persistence, or pace were not adequately explained to the VE.

The ALJ's RFC, as expressed in his written decision, states that Ms. Warren is capable of light-level exertion work and describes Ms. Warren's mental functioning capacity as follows:

> She . . . retains the mental capacity to understand, remember, and follow simple instructions. Within these parameters, and in the context of performing simple and repetitive tasks, she [is] able to sustain the attention and concentration necessary to carry out work-like tasks with reasonable pace and persistence. She would not be able to tolerate work requiring greater than average production rates, however. She further is able to do work that permits incidental contact with supervisors, co-workers, and the general public.

(R. 37). At the hearing, the ALJ asked the vocational expert about jobs available to a person capable of light-level exertion work "with the further limitations of restricted to incidental contact with the general public, co-workers, and supervisors; performance of simple, repetitive tasks, and no assembly line or greater than production rate work. I would also include fast food." (R. 756-57).

The issue before the court is whether the ALJ's RFC as described in his decision was captured within his hypothetical question to the expert. Ms. Warren

contends that the ALJ's decision reflects greater restrictions than the ALJ told the vocational expert to consider.

When, at step five, an ALJ relies on the testimony of a vocational expert regarding jobs that fit particular functional abilities, the claimant must of course actually have that functional capacity. *E.g., Jelinek v. Astrue,* 662 F.3d 805, 813 (7th Cir. 2011) ("We have stated repeatedly that ALJs must provide vocational experts with a complete picture of a claimant's residual functional capacity. . . ."). There must be some assurance that the VE's testimony regarding available jobs took into account all functional limitations stemming from physical or mental impairments the ALJ has found. *Steele v. Barnhart,* 290 F.3d 936, 942 (7th Cir. 2002).

Ms. Warren contends that the ALJ's hypothetical question did not include the following limitations expressed in his opinion: (1) inability to tolerate greater than average production rates; (2) ability to work only at reasonable pace and persistence; and (3) restriction to simple instructions jobs. We find that Ms. Warren has shown that the ALJ's limitation in his RFC to "simple instructions" was not properly communicated to the VE in the hypothetical.[2]

---

[2] The Commissioner suggests that Ms. Warren's lawyer should have alerted the ALJ at the hearing that he had not included all functional limitations in his hypothetical question to the vocational expert. This argument is nonsensical. It is not possible for a claimant to foresee an ALJ's determination of her RFC. That determination is made by the ALJ in his written decision, after taking into account the entire administrative record and testimony by the claimant and any medical experts or other witnesses at the hearing. Because an ALJ has not yet formulated a definitive RFC by the time of the hearing, he or she generally poses to the vocational expert a variety of hypothetical questions, expressing different ranges of functioning. Once the ALJ makes an RFC determination after the hearing, he may rely on vocational expert opinion about jobs availability that was elicited at the

As Ms. Warren points out, the vocational expert interpreted the ALJ's hypothetical question as restricting Ms. Warren to "unskilled" work. Some unskilled work, however, requires more than the ability to understand, remember, and follow "simple instructions." Two of the three jobs about which the VE testified and on which the ALJ relied in determining that significant jobs existed that Ms. Warren could perform require a reasoning level above "simple one- or two-step instructions." Unskilled work that the Dictionary of Occupational Titles describes as Reasoning Level 1 work is that which requires "understanding to carry out simple one- or two-step instructions." *See* Ms. Warren's Reply Brief, Dkt. 25 at pp. 6-7. But the VE included jobs that require Reasoning Level 2, a level described as requiring the ability to "[a]pply commonsense understanding to carry out *detailed* but uninvolved written or oral instructions. . . ." *See id.* (emphasis added; citing Dictionary of Occupational Titles). The Commissioner has not explained how Reasoning Level 2 jobs are consistent with the RFC, and it was her burden to show that the ALJ's step five decision is supported by substantial evidence. Because it appears that the VE included jobs that, according to Ms. Warren's RFC, she may not be capable of performing, we must remand.

On remand, the ALJ should ensure that all of his restrictions are accurately captured in his hypothetical to the expert. Ms. Warren has pointed out other ways in which the ALJ's hypothetical question does not line up perfectly with the restrictions described in his RFC. The ALJ's instruction to the VE to exclude

---

hearing so long as at least one hypothetical included the limitations the ALJ eventually determined were appropriate for the claimant.

assembly line jobs or "greater than production rate work" likely captures his opinion that Ms. Warren is capable of "reasonable pace and persistence" but cannot tolerate work greater than "average" production rates. But on remand the ALJ should make clear that he is excluding assembly line jobs and any other jobs that require a production rate higher than "average."

Ms. Warren's other complaint about the ALJ's RFC—that his restriction to "simple, repetitive work" did not adequately account for Ms. Warren's moderate limitations in concentration, persistence, and pace—should also be addressed on remand. The ALJ should ensure that the vocational expert is aware of all of the restrictions he found were appropriate: that Ms. Warren is limited to simple and repetitive work, is limited to understanding, remembering, and following simple instructions, and is limited to work that requires no greater than average production rates and only reasonable pace and persistence. The ALJ's decision indicates that all of these limitations were necessary facets of the RFC to accommodate Ms. Warren's particular moderate difficulties in concentration, persistence, and pace. *See O'Connor v. Spinner v. Astrue,* 627 F.3d 614 (7th Cir. 2010) (there must be some indication that the VE's expert opinion on jobs availability accounted for the claimant's particular deficiencies in concentration, persistence, and pace).

## Conclusion

The Commissioner's decision is REVERSED and REMANDED for proceedings consistent with this order.

IT IS SO ORDERED.

Date: 3/24/2014

*Sarah Evans Barker*

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

**Distribution:**

All ECF-registered counsel of record via email generated by the court's ECF system